This is an action for actionable negligence, brought by plaintiff, by her next friend, against defendants, alleging damages. The defendants denied negligence.
The evidence was to the effect that Betty Jean Smith, the plaintiff, a child 3 years old, was seriously and permanently injured on 18 April, 1939, in the city of Greensboro.
Henry Burke testified, in part: "Between 3 and 4 o'clock on that day I was traveling east along West Edwards' Place on the north side of Edwards' Place. At that time I saw Betty Jean Smith. She was with some lady and they were traveling on the west or north sidewalk of Edwards' Place. Just before or about the time I saw the child and the lady with her I saw an old lunch counter brought out of Jim's Lunch. I would say it was approximately 15 or 20 feet long. I could not say how tall it was but I can show you (illustrating). About that high. I don't know how many feet that is. I would say around 5 or 6 feet high. The counter was placed between the two doors on Edwards' Place (indicating). It was placed right in here. It was sitting longways just like it would in a place of business. I don't recall what kind of base or bottom the counter had. I was walking along the plate glass window there when they brought it out and I stepped aside for them to get it out. It was brought out by a colored fellow and a white fellow. I know the colored fellow. His name was John Sellars. I did not know the white fellow. The colored fellow came out of the building *Page 760 
first with the counter. About the time they set the counter up Betty Jean and the lady passed Bob's Shoe Shine Stand just back west of that. There is a hotel entrance between this place and Bob's Place. Just as the child gotabout middleways of the counter with the lady, the counter tilted over andfell, striking her foot. I stood there and looked. The child hollered and screamed. Her left foot was struck by the counter. I was going west towards Greene Street and they were going east. When I passed the counter it was just sitting there. It was sitting upright. The top part was where it was supposed to be, just like it was sitting in the lunchroom, and that was sitting against the side of the building. (The Court) Q. You mean just like that table as if it would have been in the lunchroom? Ans.: Yes, sir. I would not say the counter had been placed on the walk over a minute at the time the child passed the counter. I did not know this child prior to that time. . . . After this counter that I testified about this morning was placed out on the sidewalk, it was not out of my sight. No one other than the persons placing the counter there touched the counter. The weather on that day was very windy. I saw the counter fall."
J. O. May testified, in part: "I am an electrical contractor. I was in Jim's Lunch on the 18th day of April, 1939, at the time the child was alleged to have been hurt, I think some time between 2 and 3 o'clock. Prior to this time I had been doing some work for Jim's Lunch. They were taking out equipment. The equipment was being taken out and taken loose from the wall and I sat down there and was sitting there watching them and I sawthem remove the old equipment and put up the new. I saw Jim there with amop, mopping the floor, and I saw a fellow with brown clothes on. Q. What did you hear him say? Ans.: I heard him tell a Negro and a white man tomove the counter out, take it out on the sidewalk, that hurt this child. . . . I saw the counters and equipment taken out back up by the side of the house. I did not see the child hurt. Q. After you went out there where did you see it? Ans.: I said, I saw it laying down on the sidewalk where it had fallen there."
Frank Kivett testified, in part: "I know where Jim's Lunch is located. I was there on the afternoon of the 18th of April, 1939, around 2 o'clock or a little after 2 o'clock. I was in the building and on the outside too. There was moving and transferring and putting up new fixtures, doing wiring and different things, you know, changing the fixtures in there. On that occasion I saw an old counter there being moved. I say it was about 12 feet long, maybe longer, and the counter part was not but around 30 or 36 inches high. It was moved out on the sidewalk and placed two doors on the south side of the building. There was several pieces out there — you know, it was just throwed up — it *Page 761 
looked like to me in moving they had just picked it up and throwed it on top of each other. I reckon the pile was about six feet high or something like that and about half, maybe over half, of the sidewalk there was taken up by it. I saw something happen to the counter after this stuff was placed out there. I saw it — I was standing in the front of the building looking kind of like this (illustrating) out through the glass and I saw it had done started. I could see about that far or maybe a little bit further, and I could see the counter going over, falling south. I did not see whether or not it hit anyone at that time."
J. G. Caldwell signed the contract between Straus Company, Inc., and Jim Kappas.
C. C. Robinson, police officer of the city of Greensboro, testified that the sidewalk along the side of Jim's Lunch is 6 or 7 feet wide; that three-fourths of the sidewalk was taken up by the equipment he saw there; that he saw a man there talking to the fellows moving the fixtures. There were both old and new equipment. It was on the north side of West Edwards' Place, on the sidewalk.
Ed Leigh testified, in part: "I am a carpenter and I was working at that trade on the 18th day of April, 1939, at Jim's Lunch on the northwest corner of the intersection of Edwards' Place and Elm Street. . . . (Mr. Duke) I take the position that here is the man Caldwell that they admit is their agent. They admit that they are to install those fixtures. Now, here at the time — (The Court): I will admit it now but I may strike it out later. Q. Will you read this card, Mr. Leigh? Ans.: (Reading) `The largest Equipment and Fixture House in the South. The Straus Company, Incorporated. 1004-6-8 East Cary Street, Richmond, Virginia. Manufacturers of Hotel — Restaurant — Institutional Equipment — Store Fixtures — Soda Fountains — China — Glass — Silver. John G. Caldwell, 2214 Circle Drive, Raleigh, N.C. Phone 311.' (Mr. Duke) Q. Who directed you as to what work you were to do in that cafe? Ans.: The same gentleman I pointed out a while ago. (The Court): You say the same gentleman you pointed out a while ago? Ans.: Yes, sir. (Mr. Duke) Q. Wasthat the same gentleman who handed you that card? Ans.: Yes, sir. Q. What work did you do in Jim's Lunch, Mr. Leigh? Ans.: The back case or cabinet as you would call it, I suppose, I had to cut that plumb down from the top to the floor to allow the new section to come in. I cut it just according to his marking off . . . Q. Who paid you for the work that you did there? Ans.: (Indicating): This gentleman over there. Q. Is that the same man whogave you the card? Ans.: Yes, sir."
Plaintiff introduced a "Universal Conditional Sales Contract" Order to defendant, Straus Company, Inc., dated 10 March, 1939, duly recorded in which is the following: "Please ship to Jim Kappas — Jim's Lunch, *Page 762 
348 S. Elm Street, City of Greensboro, State N.C. the articles of personal property which are listed herein under the caption of `Description of Equipment, Etc.'. . . Above equipment delivered and installed at Jim's Lunch, Greensboro, N.C. with the exception of installation of gas equipment which will be done by others."
Plaintiff offered in evidence, in the complaint against Straus Company, Inc., among other things, a portion of paragraph 2 of the Amended Complaint, reading as follows: "That on the 18th day of April, 1939, the said equipment purchased by the defendant Jim Kappas, for Jim's Lunch as aforesaid, was delivered by the defendant, The Straus Company, Inc., acting through its employees, servants and agents, to Jim's Lunch to be installed," and a portion of paragraph 1 of the Answer of The Straus Company, Inc., to the Amended Complaint, reading as follows: "Answering the allegations of paragraph 2 of said Amended Complaint wherein the same amends paragraph 7 of the original complaint, it is admitted that on the 18th day of April, 1939, the said equipment purchased by the defendant Jim Kappas for Jim's Lunch as aforesaid was delivered by an employee of this defendant at Jim's Lunch to be installed."
The plaintiff also offered in evidence certified copy of an Ordinance of the city of Greensboro, North Carolina, marked "Exhibit P-1," which is as follows: "Chapter 50, Article 1, Sec. 1. — Not to Block Streets and Sidewalks. Section 1 — (a) — `No person, firm or corporation shall obstruct or block any street or sidewalk in the city without a written permit therefor from the superintendent of the division of maintenance.' `I hereby certify that the foregoing ordinance is a true and correct copy of said city ordinance as amended of the City of Greensboro, North Carolina, in force on April 18, 1939. This the 21st day of March, 1940. Elizabeth R. Wall, Deputy Clerk of City of Greensboro.'"
The plaintiff took a voluntary nonsuit as to the defendant Jim Kappas, trading and doing business as Jim's Lunch. This was allowed by the court below.
Jim Kappas testified, in part: "I own and operate Jim's Lunch. The Straus Company, Inc., installed that equipment in my place of business. I know what new equipment I purchased from The Straus Company, Inc. Q. Could the new fixtures be placed in there without removing the old ones? Ans.: No, they could not. Q. Who paid for labor for removing the old ones? Ans.:The Straus Company, Inc. Q. Did you have anything at all to do with the removal of the old fixtures and installing the new ones? Ans.: No, sir. Q.State whether or not you employed anyone to remove any of the old fixtures?
Ans.: No, sir. Q. State whether or not, Mr. Kappas, you have paid anyone for any of that work? Ans.: No, sir. Q. Do you know who paid for *Page 763 
the labor there in the removal of that equipment? (The Court): If he knows of his own knowledge. Q. Do you know of your own knowledge who paid the labor? Ans.: No, I did not pay anything. Q. Do you know of your own knowledge who did pay? Ans.: I think that fellow (indicating). (The Court) Of your own knowledge? Ans.: (Continuing) that fellow — he is over there. Q. Do you know who he is over there? Ans.: Mr. Patterson, themechanic for the Straus Company, Inc. Q. Who is he? Ans.: He is over there. Q. What does he do? Ans.: He was installing fixtures, the stuff. . . . (Cross-examination) Yes, an electrician disconnected it. I paid the electrician. I did not pay anyone except this one. I did not pay anyone else about that old equipment. The old equipment was mine. He took it out. . . . (Recross-examination) They had a colored fellow and a carpenter thereto move it. Here is the counter and the carpenter, he helped move it out."
The child, on the day of the injury, was with Mrs. Hazel Potter. A subpoena was issued for Mrs. Potter and "After diligent search Mrs. Hazel Potter not to be found in Guilford County, Joe S. Phipps, Sheriff."
The defendant introduced no evidence. The issues submitted to the jury and their answers there, were as follows:
"1. Was the plaintiff injured by the negligence of agents or servants of the defendant, The Straus Company, Inc., while acting in the course and scope of their employment in delivering and installing the equipment described in the complaint? Ans.: `Yes.'
"2. What damage, if any, is the plaintiff entitled to recover? Ans.: `$9,500.00.'"
The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
At the close of plaintiff's evidence, the defendant, the Straus Company, Inc., made a motion in the court below for judgment as in case of nonsuit. C. S., 567. The court below overruled this motion and in this we can see no error.
It is well settled that on motion of nonsuit the evidence which makes for plaintiff's claim, or tends to support her cause of action, is to be taken in the light most favorable to the plaintiff, and she is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom. *Page 764 
In stating the facts we did not set forth the exceptions and assignments of error or motions to strike made by defendant. They were timely and fully made by defendant to reserve every right it had. Straus Company, Inc., denied that it was liable and alleged that there was no evidence that the injury was caused by it.
In Jones v. Bank, 214 N.C. 794 (798), we find: "Hoke, J., in Powell v.Lumber Co., 168 N.C. 632, at p. 635, speaking to the question, says: `The general agent is one who is authorized to act for his principal in all matters concerning a particular business or employment of a particular nature. Tiffany on Agency, p. 191. And it is the recognized rule that such an agent may usually bind his principal as to all acts within the scope of his agency, including not only the authority actually conferred, but such as is usually "confided to an agent employed to transact the business which is given him to do," and it is held that, as to third persons, this real and apparent authority is one and the same, and may not be restricted by special or private instructions of the principal unless the limitations sought to be placed upon it are known to such persons or the act or power in question is of such an unusual character as to put a man of reasonable business prudence upon inquiry as to the existence of the particular authority claimed (citing authorities). The power of an agent, then, to bind his principal may include not only the authority actually conferred, but the authority implied as usual and necessary to the proper performance of the work entrusted to him, and it may be further extended by reason of acts indicating authority which the principal has approved or knowingly or, at times, even negligently permitted the agent to do in the course of his employment,' citing authorities. Bobbitt Co. v. Land Co., 191 N.C. 323
(328); Maxwell v. Distributing Co., 204 N.C. 309 (317-18); Dixon v.Realty Co., 204 N.C. 521; R. R. v. Lassiter Co., 207 N.C. 408; Belk'sDept. Store v. Ins. Co., 208 N.C. 267 (271); Grubb v. Motor Co.,209 N.C. 88." Dickerson v. Refining Co., 201 N.C. 90; Westv. Woolworth Co., 215 N.C. 211 (214); Warehouse v. Bank,216 N.C. 246 (253-4).
Where the seller of a range, who has agreed to deliver it, with the necessary piping, and set it up ready for use, sends it by an agent, who sets it up in a defective and dangerous manner, the jury are authorized to infer that in so doing he was acting within the scope of his agency.Wrought-Iron Range Co. v. Graham, 80 F. 474, 25 C.C.A., 570.
The evidence was to the effect that in the contract between Jim Kappas (Jim's Lunch) and the defendant, Straus Company, Inc., is the following: "Above equipment delivered and installed at Jim's Lunch, Greensboro, N.C." In Webster's Dictionary, "installed" is defined as follows: "To set or fix, as a lighting system, for use or service." Before the new equipment could be "installed," the old equipment had to be *Page 765 
removed. Jim Kappas testified that Straus Company, Inc., installed the equipment that he purchased from it; that this new equipment could not be installed without the removal of the old fixtures. He did not pay for the labor, but, of his own knowledge, it was Mr. Patterson, the mechanic for Straus Company, Inc., who installed it. Patterson was pointed out "He was installing fixtures, the stuff." "They had a colored fellow and a carpenter there to move it. The carpenter helped move it. . . . The old equipment was mine, he took it out." The defendant introduced no evidence and Mr. Patterson was not put on the stand to deny what Kappas said. Kappas in his testimony pointed out Patterson, sitting in the court, as the mechanic for Straus Company, Inc., who was installing the fixtures. Patterson was never put on the stand.
In In re Hinton, 180 N.C. 206 (213), Walker, J., said: "Evidence of this kind was competent for the jury to consider, for when one can easily disprove a charge by testimony within his control, and which he can then produce, and fails to do it, it is some proof that he cannot refute the charge." In York v. York, 212 N.C. 695 (702), the above is quoted and it is there said: "The rule of the Hinton case, supra, has been repeatedly approved and followed in recent cases decided by this Court. See Walker v.Walker, 201 N.C. 183 (184); Puckett v. Dyer, 203 N.C. 684 (690);Maxwell v. Distributing Co., 204 N.C. 309 (316)."
John G. Caldwell signed the contract between Straus Company, Inc., and Kappas. He was in the court and pointed out by Ed Leigh as the man who gave him employment and paid him for taking down some of the old fixtures to put in the new. We think the card competent to identify the man who employed him and whose name was on the card. The advertising portion is not important. There was no request that it be limited.
In Realty Co. v. Rumbough, 172 N.C. 741 (748-9), quoting from 1 Mechem on Agency, sec. 261, p. 185, it is written: "`The existence of agency is a fact, and, like other facts, may be proved by any evidence traceable to the alleged principal and having a legal tendency to establish it. Informal writings of the alleged principal, his letters, telegrams, book entries, and the like are clearly admissible. But it need not be proved by written instruments (except in the cases already mentioned) or by express or formal oral language. The agency may be shown by conduct, by the relations and situation of the parties, by acts and declarations, by matters of omission as well as of commission, and, generally, by any fact or circumstances with which the alleged principal can be connected and having a legitimate tendency to establish that the person in question was his agent for the performance of the act in controversy,' *Page 766 
etc. `Agency, like any other controvertible fact, may be proved by circumstances. It may be inferred from previous employment in similar acts or transactions, or from acts of such nature and so continuous as to furnish a reasonable basis of inference that they were known to the principal, and that he would not have allowed the agent so to act unless authorized. In such cases the acts or transactions are admissible to prove agency. But in order to be relevant the alleged principal must in some way directly or indirectly be connected with the circumstances. The agent must have assumed to represent the principal, and to have performed the acts in his name and on his behalf.' Hill v. Helton, 80 Ala. 528 (533). Mr. Mechem further says that for the purpose of proving agency a wide range may often be properly given to the testimony, provided that which is offered has a real probative tendency toward the main question in issue, or, in other words, legitimately tends to prove the fact of agency so that the jury may reasonably deduce from it that such agency existed. 2 Mechem, sec. 261, p. 187."
In Hunsucker v. Corbitt, 187 N.C. 496 (503), quoting Lockhart's Handbook on Evidence, sec. 154, and citing a wealth of authorities, we find: " `Admissions by agents, made while doing acts within the scope of the agency, and relating to the business in hand, are admissible against the principal when such admissions may be deemed a part of the res gestae, but such admissions are not admissible to prove agency; the agency must be shown aliunde before the agent's admissions will be received.'"
It was in the sound discretion of the court below to allow evidence of admissions of facts and circumstances to show agency before the fact of the agency was established aliunde.
The defendant contends that "The court erred in permitting a voluntary nonsuit as to the defendant, Jim Kappas, before the close of plaintiff's evidence; in overruling appellant's motion for mistrial, after such voluntary nonsuit, in order to permit appellant an opportunity to avail itself of its rights under C. S., 618, to have said Kappas made a party defendant, as a joint tort-feasor; in signing judgment of voluntary nonsuit as to said Kappas; in thereafter denying motion of appellant, under C. S., 618, before judgment, to make said Kappas a party defendant, and in refusing to sign an order tendered by appellant, before judgment, to make said Kappas a party defendant herein."
The plaintiff sued Kappas and the Straus Company, Inc., as joint tort-feasors. The complaint, Article 13, alleges: "That the joint and several negligence and carelessness of the defendants Jim Kappas and the Straus Company, Inc., was the direct, proximate and sole cause of the injury and damage to the plaintiff, as aforesaid." In the answer of *Page 767 
Straus Company, Inc., is the following: "That the allegations of Article 13 of the complaint are denied."
The amendment to answer of defendant Straus Company, Inc., alleges: "That this defendant denies that the plaintiff was injured through its negligence, as alleged in the pleadings of the plaintiff, and alleges that if the plaintiff received any injuries by reason of the falling of any counter or other restaurant equipment, such injuries were either unavoidable or were caused by the negligence of Jim Kappas, trading and doing business under the style and firm name of Jim's Lunch; but if this defendant was negligent, as alleged in the pleadings of the plaintiff, such negligence on its part concurred with the negligence of said Jim Kappas, and such negligence on the part of both of them was the proximate cause of the injuries of the plaintiff. . . . And prays also that the said Jim Kappas, trading and doing business under the style and firm name of Jim's Lunch, be made a party defendant in this action in the manner and for the purposes set forth in section 618 of the North Carolina Code, 1939, and for such other and further relief as to the court may seem just and proper."
In Bargeon v. Transportation Co., 196 N.C. 776 (777), is the following: "Can one defendant, sued alone for personal injury, file an answer denying negligence and liability, and then proceed to allege that the injury was due to the specific acts of negligence of a third party, and thereupon, without asking relief against such third party, have such party brought into the suit? It is well settled under our system of procedure that in order to hold a party in court a cause of action must be alleged against him. If a defendant against whom a cause of action exists alleges a cause of action against a codefendant, growing out of the same matter, then all the parties are in court and the causes must be tried upon their merits. Bowman v. Greensboro, 190 N.C. 611, 130 S.E. 502; Ballinger v.Thomas, 195 N.C. 517, 142 S.E. 761." See Montgomery v. Blades,217 N.C. 654.
In Perry v. Sykes, 215 N.C. 39 (43), we find: "The defendant does not contend that, ordinarily, a nonsuit cannot be had at the close of plaintiff's evidence, when it is sufficient to go to the jury. A defendant cannot be kept in the case in the mere capacity of a scapegoat, performing no other useful function. But the appealing defendant insists that it had the right to keep Sykes in the case as a joint tort-feasor, from whom it would be entitled to contribution under C. S., 618 (Michie's 1935 Code). The answer simply denies negligence on the part of the Blue Bird Cab Company, and alleges that the negligence of Sykes was the sole proximate cause of the injury. The answer makes no demand for affirmative relief, and is insufficient to support the exception. Walker v. Loyall, 210 N.C. 466,187 S.E. 565; Ballinger v. Thomas, 195 N.C. 517, 142 S.E. 761." *Page 768 
In the present case we think the voluntary nonsuit was improperly granted. In the Perry case, supra, "the answer made no demand for affirmative relief." In the original answer in the present action no demand was made for affirmative relief, but before the trial an amended answer was filed by the Straus Company, Inc., which we think sufficient to have Kappas held as a party defendant under N.C. Code, 1939 (Michie), sec. 618, which, in part, is as follows: "In all cases in the courts of this state wherein judgment has been, or may hereafter be, rendered against two or more persons or corporations, who are jointly and severally liable for its payment either as joint obligors or joint tort-feasors, and the same has not been paid by all the judgment debtors by each paying his proportionate part thereof; if one of the judgment debtors shall pay the judgment creditor, either before or after execution has been issued, the amount due on said judgment, and shall, at the time of paying the same, demand that said judgment be transferred to a trustee for his benefit, it shall be the duty of the judgment creditor or his attorney to transfer without recourse such judgment to a trustee for the benefit of the judgment debtor paying the same; and a transfer of such judgment as herein contemplated shall have the effect of preserving the lien of the judgment and of keeping the same in full force as against any judgment debtor who does not pay his proportionate part thereof to the extent of his liability thereunder in law and in equity, and in the event the judgment was obtained in an action arising out of a joint tort, and only one, or not all of the joint tort-feasors were made parties defendant, those tort-feasors made parties defendant and against whom judgment was obtained, may, in an action therefor, enforce contribution from the other joint tort-feasors; or at any time before judgment is obtained, the joint tort-feasors made parties defendant may, upon motion, have the other joint tort-feasors made parties defendant."
In Mangum v. R. R., 210 N.C. 134 (137), it is said: "In accordance with this section (618), the defendants Southern Railway Company and North Carolina Railroad Company (original parties) prayed that the receivers of Seaboard Air Line Railway Company, residents of Virginia, be made parties defendant, and allege that they are not guilty of negligence; but further allege, in substance, that if they are guilty of negligence they are liable only as joint tort-feasors with the receivers. We think that this procedure is permissible under the section, supra. The plaintiff, from her allegations in the complaint against the original defendants, cannot be affected by this procedure of the original defendants under the statute bringing in the receivers as joint tort-feasors." Freeman v. Thompson,216 N.C. 484.
It goes without saying that at the close of plaintiff's evidence or at the close of all the evidence, if there was no sufficient evidence to be submitted *Page 769 
to the jury under N.C. Code, supra, sec. 567, against the defendant Jim Kappas, the court below could have, on proper motion made by him, granted a nonsuit.
The painstaking and careful judge in the court below had no direct authority from this Court to guide him in the procedure under this statute. We think defendant Straus Company, Inc., alleged enough in its amended answer to hold Jim Kappas in the action so that the rights of both could be determined in the present action, and that there was error in granting the motion for nonsuit complained of.
For the reasons given, there must be a
New trial.